# United States Court of Appeals
## For the Eighth Circuit

_____

No. 25-2127
_____

United States of America

*Plaintiff - Appellee*

v.

Shaquiel Anthony Mendez

*Defendant - Appellant*
_____

Appeal from United States District Court
for the District of North Dakota - Eastern
_____

Submitted: February 13, 2026
Filed: July 15, 2026
_____

Before COLLOTON, Chief Judge, BENTON and KELLY, Circuit Judges.
_____

KELLY, Circuit Judge.

Shaquiel Mendez was convicted after a trial of conspiracy to tamper with a witness in violation of 18 U.S.C. § 1512(k), by way of physical force or threat of physical force under § 1512(a)(2)(A) and § 1512(a)(2)(C), and the district court[1] sentenced him to 240 months of incarceration. Mendez appeals.

---

[1]The Honorable Peter D. Welte, United States District Judge for the District of North Dakota.

I.

On August 28, 2020, Joshua Brooks gathered three friends, including Jesse Burnett and Andeus Smith, to confront a family he believed had stolen money and marijuana from him. The group drove to a Fargo apartment complex where they saw people they believed were members of the family standing outside. Burnett had a gun and offered to fire it in the air to scare them but shot directly at them instead. No one in Brooks's group ever got out of the car; Brooks, who was driving, sped away. The next day, Brooks learned that Burnett's shots had struck a man who later died from his injuries.

Law enforcement investigated, but the case went cold until July 2022, when Smith—then a defendant in a federal firearms case—agreed to a proffer interview with federal agents. Smith's interview was the genesis of a joint federal and state investigation into a drug trafficking conspiracy, which resulted in Brooks's September 2022 arrest on state murder charges for the August 2020 shooting. A federal agent assisted in the arrest and informed Brooks that federal and local law enforcement were involved. Brooks agreed to cooperate and was interviewed in October 2022 by federal and state law enforcement. During the interview, Brooks told law enforcement when and where Burnett purchased the firearm used in the August 2020 shooting. Officers cross-referenced the firearms dealer's records and confirmed Burnett had purchased a gun at the relevant time. Burnett was arrested on state murder charges the next day.

As a result of their state charges, Brooks and Burnett were both held in custody at the Cass County Jail—the same jail where Mendez happened to be incarcerated. For a time, Burnett and Mendez were housed in the same unit. They became friends.

Then Mendez was moved to Brooks's unit. At some point, Mendez told Brooks that Burnett thought Brooks was "snitching on [Burnett]" about the August 2020 shooting. Brooks would later report Mendez's statements to law enforcement,

including that Mendez said Brooks had "been informing the FBI and detective and [federal prosecutor] about all the guns" Burnett had purchased.

Mendez soon requested a transfer back to Burnett's unit. The request was granted for a day, but the jail quickly realized they made a mistake because of restrictions on Mendez's housing. During that single day, jail surveillance video captured Burnett showing and then giving Mendez some pages of his discovery materials.

Mendez brought those pages with him when he returned to Brooks's unit. Mendez gave the pages to another friend, Daniel Cisse, who kept them in his cell overnight. Mendez, Cisse, and a third man, Ahmed Hassan, talked about the discovery materials through vents in their cells. Cisse said he would assault Brooks the next day, and Mendez and Hassan agreed to act as lookouts.

The next day, during recreation time, Cisse, Mendez, Hassan, and Brooks played basketball together. After a few minutes, Cisse handed Brooks the pages of discovery, said he got them from Mendez, and accused Brooks of snitching. Mendez said the pages came from Burnett and told Brooks, "I thought the feds didn't give out paperwork." Cisse then physically assaulted Brooks for approximately five minutes while Mendez and Hassan distracted the guards.

When the guards finally intervened, they recovered the pages of discovery and connected them to Burnett. They then obtained a warrant to search Burnett's belongings. Burnett was missing four pages of discovery—which matched the pages recovered after the assault. One of those pages included a police report describing Brooks's proffer interview.

Mendez was indicted on one count of conspiracy to tamper with a witness, and a jury found him guilty. Mendez appeals, arguing the government did not present sufficient evidence to prove a federal nexus, as is required to sustain the conviction.

-3-

## II.

Mendez's indictment charged him with conspiracy to commit witness tampering under 18 U.S.C. § 1512(k), specifically by using "physical force or the threat of physical force with intent to: (1) influence, delay, or prevent the witness from testifying in an official proceeding, namely, a federal grand jury and trial, and (2) hinder, delay, or prevent the witness from communicating to law enforcement about a possible federal criminal offense, in violation of" 18 U.S.C. §§ 1512(a)(2)(A) and 1512(a)(2)(C), respectively. To convict, it was not necessary for the jury to find both (1) and (2); § 1512(k) requires only one or the other. And though the district court instructed the jury that it "must unanimously agree on which purpose or purposes motivated the members of the agreement to act," the verdict form contained no special interrogatories regarding whether Mendez conspired to tamper with a witness in violation of § 1512(a)(2)(A) or § 1512(a)(2)(C). So we need only determine whether, "evaluating the evidence in the light most favorable to the verdict and drawing all reasonable inferences in its favor," the government presented sufficient evidence to convict Mendez under one of the two charged subsections of the statute. United States v. Abdullahi, 144 F.4th 1034, 1039 (8th Cir. 2025); United States v. Foard, 108 F.4th 729, 734 (8th Cir. 2024) ("[W]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged." (quoting Griffin v. United States, 502 U.S. 46, 56–57 (1991))).

Both types of witness tampering at issue here require a "federal nexus," either by a connection to an official proceeding, as in § 1512(a)(2)(A), or by communication with federal law enforcement pertaining to a federal offense, as in § 1512(a)(2)(C). See also United States v. Shavers, 693 F.3d 363, 377–79 (3d Cir. 2012), vacated on other grounds by Shavers v. United States, 570 U.S. 913 (2013) (distinguishing between the "two lines of jurisprudence" for federal nexus requirements: one for official proceedings, and one for communications with a federal law enforcement officer). According to Mendez, the government failed to present sufficient evidence to prove a federal nexus under either subsection.

We start with § 1512(a)(2)(C), which criminalizes the use of physical force with intent to "hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings." 18 U.S.C. § 1512(a)(2)(C). In Fowler, the Supreme Court interpreted similar language from a parallel subsection of the witness tampering statute. See generally Fowler v. United States, 563 U.S. 668 (2011) (interpreting 18 U.S.C. § 1512(a)(1)(C), which criminalizes the killing of a prospective witness); see also Lobbins v. United States, 900 F.3d 799, 802 (8th Cir. 2018) (applying Fowler to § 1512(a)(2)(C)). The Court made clear that the statute requires a connection to a federal law enforcement officer or judge. See Fowler, 563 U.S. at 675 (explaining that "to allow the government to show no more than . . . the intent to prevent communications to law enforcement officers in general[] would bring within the scope of this statute many instances of witness tampering in purely state investigations and proceedings, thus extending the scope of this federal statute well beyond the primarily federal areas that Congress had in mind").

In addition, when a defendant acts "with an intent to prevent communication with law enforcement officers generally, that intent includes an intent to prevent communications with *federal* law enforcement officers only if it is reasonably likely under the circumstances that (in the absence of the [witness tampering]) at least one of the relevant communications would have been made to a federal officer." Fowler, 563 U.S. at 672, 677–78. To meet this standard, the government need not prove "that such a communication, had it occurred, would have been federal beyond a reasonable doubt, nor even that it is more likely than not." Id. at 678. But it must do more than show the commission of a federal offense; it "must show that the likelihood of communication to a federal officer was more than remote, outlandish, or simply hypothetical." Id. at 676, 678.

Our Circuit has not yet applied the reasonable likelihood standard espoused in Fowler. But other circuits doing so have considered whether the witness had already communicated with federal law enforcement officers prior to the alleged tampering. See, e.g., United States v. Tyler, 956 F.3d 116, 128 (3d Cir. 2020) (holding it was reasonably likely a woman would have communicated with a federal officer where a particular federal officer already met with her "more than ten times"); Lobbins, 900 F.3d at 802–03 (reversing a § 1512(a)(1)(C) conviction where the alleged tampering was "investigated by state officials, prosecuted in state court, and" sentenced by a state judge, and the allegedly tampered-with witness "spoke to a state prosecutor, not a federal one"). We do the same.

Here, it was reasonably likely that Brooks would have spoken to a federal officer if he had not been assaulted. As Mendez acknowledged in his motion for acquittal at trial, "Brooks had already proffered. He had already communicated with federal law enforcement about the commission of the [August 2020] murder" by the time he was assaulted. There is no indication in the record that Brooks had withdrawn from or otherwise terminated his communication with federal law enforcement officers prior to the assault. Though Mendez argues his conviction is paradoxical—Mendez could not conspire to prevent a *prior* communication—the jury could conclude that a person who spoke with federal law enforcement before was reasonably likely to speak with federal law enforcement again, especially because the case in which Brooks proffered had not yet gone to trial when the assault occurred.[2] Indeed, at Mendez's trial, the government elicited testimony from Cisse

---

[2]Brooks, pursuant to his plea agreement, continued to communicate with federal officers after the assault and ultimately testified in federal court. But Brooks's actual communications with federal law enforcement officers after the alleged tampering are not helpful to our analysis here. Fowler, 563 U.S. at 677–78 (holding courts must analyze the likelihood of communication with a federal officer in the absence of the alleged tampering); Lobbins, 900 F.3d at 804 ("Simply stated, that an assault *resulted in* conversations with federal officials hardly means that the defendant engaged in the assault to *prevent* them. See United States v. Johnson, 874 F.3d 1078, 1082 (9th Cir. 2017) (rejecting a similar argument as 'nonsensical').").

affirming that the purpose of the assault was, in part, to prevent Brooks from communicating to a law enforcement officer about a possible federal criminal offense. On this record, the government met its burden to establish a federal nexus in accordance with 18 U.S.C. § 1512(a)(2)(C).[3]

We affirm the judgment of the district court.

_____

---

[3]Because the government presented sufficient evidence under § 1512(a)(2)(C), we need not decide whether it also met its burden under § 1512(a)(2)(A).